IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

UNITED STATES OF AMERICA,          )
                                   )
            Plaintiff,             )
                                   )
v.                                 )          No. 3:22-CR-43-TAV-JEM
                                   )
MICHAEL HARRIS,                    )
                                   )
            Defendant.             )

**REPORT AND RECOMMENDATION**

This case is before the undersigned for report and recommendation on Defendant Michael

Harris's Motion to Suppress [Doc. 46].[1] *See* 28 U.S.C. § 636(b). Defendant is charged by

Indictment with possession of fifty grams or more of methamphetamine with intent to distribute

in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A) (Count One), possession of a firearm in

furtherance of drug trafficking in violation of 18 U.S.C. § 922(c)(1)(A) (Count Two), and being

a felon in possession of a firearm in violation of 18 U.S.C. § 922(g) (Count Three) [Doc. 9]. All

three charged offenses allegedly occurred on April 24, 2022 [*Id.*]. These charges arise out of the

detention of Defendant and search of his vehicle on that date. Defendant argues the seizure and

frisk of his person and the search of his vehicle violated his rights under the Fourth Amendment.

On April 24, 2022, a joint task force of state and federal law enforcement was

investigating illegal firearms sales at a gun show. Undercover officers observed Defendant

purchasing multiple firearms at the gun show while on a video call with a third party. After

observing Defendant load the firearms into his vehicle, undercover officers followed Defendant

---

[1]     The undersigned permitted Defendant to file a suppression motion after the expiration of
the motion deadline [Doc. 45].

from the gun show, hoping to stop Defendant for a traffic violation. An undercover officer lost track of Defendant's vehicle after observing Defendant make a left turn from outside the designated turn lane. Shortly thereafter, law enforcement located Defendant's vehicle at a gas station and detained him during a traffic stop. Upon approaching the vehicle's open window, the officer noticed the odor of marijuana coming from Defendant's vehicle. The officer asked Defendant to get out of the vehicle, frisked him, and then searched inside his pockets pursuant to Defendant's consent, removing two cellular telephones and a large amount of currency. Law enforcement searched the vehicle and seized firearms and controlled substances.

Defendant argues that officers unlawfully seized him because they lacked probable cause of a traffic violation or reasonable suspicion of any crime. He argues that he was arrested without probable cause and frisked without reasonable suspicion. He also challenges the warrantless search of his vehicle.

After reviewing the evidence, the arguments of the parties, and the relevant law, the undersigned finds the officers had probable cause to conduct a traffic stop after witnessing Defendant commit a traffic violation. The undersigned also finds that Defendant was properly detained during both the traffic stop and the search of the vehicle and was frisked for officer safety. Finally, the undersigned finds officers had probable cause to search Defendant's vehicle after smelling the odor of marijuana from within. The undersigned therefore recommends that the District Judge deny Defendant's motion to suppress.

## I.    SUMMARY OF THE EVIDENCE

The parties appeared before the undersigned on July 6, 2023, for an evidentiary hearing on Defendant's motion to suppress. Assistant United States Attorney Anne-Marie Svolto

2

appeared on behalf of the Government. Attorney Richard L. Walter represented Defendant Harris, who was also present.

At the evidentiary hearing, the Government presented the testimony of Knox County Sheriff's Office ("KCSO") Detective Marcus Parton ("Detective Parton"), who testified that he has worked for the KCSO for eleven years, has investigated drug trafficking for two years, and has held the title of detective for one year [Doc. 54 pp. 8–9]. He is trained to conduct traffic stops and authorized to write traffic citations [*Id*. at 9]. He stated that he is familiar with Tennessee traffic laws and routinely conducts traffic stops, estimating his annual total to be "dozens" [*Id*.].

Detective Parton stated that on April 24, 2022, he was involved in a multi-agency investigation at a gun show at the Knoxville Expo Center [*Id*. at 10, 12]. He stated officers from the Bureau of Alcohol, Tobacco, and Firearms ("ATF"), the Knoxville Police Department ("KPD"), and KCSO were conducting the investigation of individuals illegally purchasing firearms [*Id*. at 10]. He said undercover officers were conducting surveillance inside the Expo Center and in the parking lot [*Id*.]. Detective Parton stated that he was in the parking lot in an unmarked vehicle and wearing plain clothes, and his role was to watch individuals based upon information relayed from the officers inside the Expo Center [*Id*.]. He said undercover officers were stationed in the parking lot to watch people identified by the officers inside and to follow them as they drove away from the Expo Center, so that others would not be alerted to the investigation [*Id*. at 11]. He said officers from the various agencies were using a designated radio channel to communicate [*Id*. at 16].

Detective Parton testified that during the investigation, he received information from officers inside the Expo Center about a man in red clothing who appeared to be making "straw purchases" for another person [*Id*. at 12, 43]. He said the officers inside relayed that the

3

individual was going from booth to booth describing the firearms and accessories to someone via FaceTime [*Id*. at 12]. Detective Parton characterized this behavior as a "major red flag" that the person was engaged in illegal firearm purchases [*Id*.]. He said the officers inside radioed that they would let the officers in the parking lot know when the individual was leaving the Expo Center [*Id*. at 13]. Detective Parton stated that, after receiving information that the person was leaving the Expo Center, he watched the individual get into the driver's seat of a maroon minivan and leave [*Id*. at 13–14]. His role at that point was to follow the individual away from the Expo Center so that a uniformed officer in a marked patrol car could conduct a traffic stop [*Id*. at 14]. He said as he followed the individual, he was looking for traffic violations [*Id*. at 15]. According to Detective Parton, if he saw a traffic violation, he would radio the uniformed officers to conduct the traffic stop so that he would not alert anyone to the undercover operation [*Id*. at 15–16].

Detective Parton further testified that as he followed the minivan, the individual began counter-surveillance techniques, which was another red flag [*Id*. at 14]. He said as an undercover officer, he was not wearing a body camera and his unmarked vehicle did not have a dash camera [*Id*. at 18]. Detective Parton identified a recording of the radio communications from that day [*Id*. at 18; Exh. 1]. He agreed that a six-minute segment from 13:30 to 19:30[2] on the recording related to the minivan [Doc. 54 p. 18]. He noted that the radio channel is automatically recorded only when people are talking and not during the "dead space" [*Id*. at 19].

The Government played the recording from 13:30 to 13:47, during which one officer asked if they were going to stop the van, and another officer responded affirmatively, "if we can get PC" [Exh. 1 at 13:30–40]. Detective Parton testified that getting "PC," which stands for

---

[2]    The citations to the audio recording are to time elapsed from the start of the recording [Exh. 1].

4

probable cause, would be accomplished by observing a traffic violation [Doc. 54 pp. 21, 56; Exh. 1 at 13:35–47]. He said KCSO Narcotics Detective Christian Pickett, who was stationed in the Expo Center's parking lot in an unmarked vehicle, alerted the other officers that the minivan was moving and leaving the parking lot [Doc. 54 p. 20; Exh. 1 at 13:40–47]. After listening to another portion of the recording, Detective Parton explained that Detective Pickett informed the other officers of the general direction in which the minivan was traveling through the parking lot [Doc. 54 p. 21; Exh. 1 at 13:47–57]. Detective Parton said as the minivan turned onto Clinton Highway, a uniformed officer in a marked patrol also began following it [Doc. 54 p. 22; Exh. 1 at 13:57–14:23]. He said also on the recording, an undercover officer in an unmarked black Chevrolet High Country pickup truck let the uniformed officer know he was following his patrol car [Doc. 54 p. 22; Exh. 1 at 14:19–21].

After listening to another portion of the recording, Detective Parton stated Detective Pickett, who was in the unmarked pickup truck, took the lead in following the minivan and looking for "PC" because the driver of the minivan would know that the officer in the marked unit, which had no window tint, was watching him [Doc. 54 p. 23; Exh. 1 at 14:23–41]. Detective Parton stated that the recording reflects that the red Chrysler minivan was going below the speed limit and turned into a Popeyes restaurant [Doc. 54 p. 25; Exh. 1 at 14:41–15:10]. He explained that both the marked patrol car and Detective Pickett continued past the Popeyes after the minivan turned into the restaurant [Doc. 54 p. 25; Exh. 1 at 15:10–25]. Detective Parton said at that point, he was traveling on Clinton Highway with the Popeyes in view [Doc. 54 p. 25]. He testified that the minivan did not go through the Popeyes drive-thru or order any food but, instead, drove around the building and exited the Popeyes parking lot traveling in the same direction as before [Doc. 54 pp. 25–26; Exh. 1 at 15:25–40]. Detective Parton said this tactic is

known as a "heat check" and involves the target checking to determine if he is being surveilled by law enforcement [Doc. 54 pp. 25–26].

Detective Parton stated that he was behind the minivan traveling south on Clinton Highway past the Nissan dealership [*Id*. at 26]. He said that as they approached the traffic light at Tillery Drive, which was red, both he and the minivan were in the "number one lane," which is for vehicles traveling straight through the intersection toward the interstate [*Id*.]. Beside them was a left turn lane [*Id*.]. Detective Parton said when the light turned green, the minivan abruptly turned left, cut across the turn lane onto Tillery Drive, and immediately turned left again onto Schubert Road, which resulted in the minivan heading northbound on a street parallel to Clinton Highway [*Id*. at 27; Exh. 1 at 15:52–56]. He said that the minivan's left turn was a traffic violation, specifically an illegal lane change [Doc. 54 p. 27; Exh. 1 at 15:58–16:00 (stating subject made an illegal turn), 17:11–22 (stating subject turned left but was not in the turn lane)]. According to Detective Parton, shortly thereafter, officers located the minivan at a Shell gas station, and undercover officers continued surveillance until a marked patrol car could arrive on the scene [Doc. 54 p. 28; Exh. 1 at 16:50–18:10].

Detective Parton identified the location where the minivan turned left onto Tillery Drive on a map and in two photographs showing the lanes of travel [Doc. 54 pp. 30–31; Exh. 2–4]. He did not recall any vehicles being in the left turn lane from Clinton Highway onto Tillery Drive on that day [Doc. 54 p. 31]. He agreed that the minivan's left turn from the "straight-only" lane on Clinton Highway, rather than the turn lane, onto Tillery Drive was an illegal lane change [*Id*. at 31–32]. Detective Parton stated he did not conduct a traffic stop at that time because he was in an unmarked vehicle and turning left to follow the minivan would have been unsafe [*Id*. at 33]. He said he radioed the traffic violation and the minivan's route to other officers [*Id*. at 33–34].

Detective Parton said the minivan traveled to a gas station a few miles north of the Expo Center [*Id*. at 34]. The traffic stop occurred in the parking lot of the gas station [*Id*.]. He did not participate in the traffic stop but, instead, watched from an elevated parking lot next to the gas station [*Id*. at 34–35].

Detective Parton stated that two marked patrol units arrived at the gas station to conduct the traffic stop [*Id*. at 35]. He said Sergeant Geddings was on the passenger side of the minivan searching it, while the driver was standing near the front of one of the patrol cars [*Id*.]. Detective Parton stated that he saw the driver walk toward the minivan and the other officers moving toward the driver [*Id*. at 36]. He said the driver increased his speed, jumped into the minivan, and drove away [*Id*.]. Detective Parton stated that he activated his emergency equipment and pursued the minivan [*Id*.]. He said the minivan drove around a blind curve and struck two vehicles traveling in the opposite direction [*Id*.]. Detective Parton stated that he saw the driver get out of the minivan and flee into the woods [*Id*. at 36–37]. He radioed to the other officers that the suspect was fleeing on foot [*Id*. at 37; Exh. 1 at 19:05–09].

Detective Parton testified that two other officers followed the driver into the woods, while he ran along a gravel road to intercept the driver [Doc. 54 p. 39]. He said once they located the driver sitting by a tree, the driver did not follow his commands to lie on his stomach or to put his hands up, and when the other officers seized the driver, he resisted [*Id*. at 39–40]. The officers took the driver into custody, returned him to the accident scene, and placed him in a patrol car [*Id*. at 40]. Detective Parton identified Defendant Michael Harris as the driver of the minivan [*Id*.].

On cross-examination, Detective Parton testified that his primary duty is to target drug trafficking [*Id*. at 42]. He agreed he is familiar with traffic rules and regulations and performs a

traffic stop approximately once weekly [*Id.*]. While waiting outside the Expo Center in an unmarked vehicle, he heard officers inside the Expo Center discussing Defendant Harris over the radio [*Id.* at 43]. He agreed that from the radio reports, he knew Defendant was wearing red clothing, which served to identify him as he exited the Expo Center [*Id.*]. Detective Parton did not recall whether the officers inside also identified Defendant as an African American male [*Id.* at 44]. He said Defendant's race and clothing did not make him suspicious but served to identify Defendant to the officers outside the Expo Center [*Id.*]. Detective Parton said the officers inside also reported that Defendant was going from booth to booth while on FaceTime [*Id.* at 44–45]. He agreed that he did not know to whom Defendant was talking [*Id.* at 45]. He said the fact that Defendant was talking to another person caused the officers to believe Defendant was purchasing firearms for someone off site [*Id.*]. Detective Parton said the belief that Defendant was engaged in straw purchases was based on his training and experience as well as the training and experience of the other officers involved in the case [*Id.* at 46].

Detective Parton stated that he originally thought Defendant would be "handing something off" when he came to the parking lot but acknowledged that did not happen [*Id.* at 46–47]. There was another person inside the Defendant's minivan, but he did not know if there was an exchange with that person [*Id.* at 47]. Detective Parton agreed at the point that Defendant entered the minivan, law enforcement did not have probable cause to stop him but asserted that they did have reasonable suspicion [*Id.*]. He said reasonable suspicion was based upon multiple officers following Defendant and overhearing him describing the firearms and accessories he saw at the show to another person via FaceTime [*Id.* at 48].

Detective Parton agreed that Defendant left the Expo Center in the minivan and proceeded to Clinton Highway [*Id.*]. He said Detective Pickett was following Defendant in an

unmarked black pickup truck, and Sergeant Geddings also followed Defendant in a marked vehicle [*Id*.]. He was also following the Defendant, making a total of three police vehicles following the minivan [*Id*. at 49–50]. Detective Parton said he was following Defendant at "quite a distance" so that he would not be associated with the marked patrol car [*Id*.]. He said although the officers did not need to observe a traffic violation to stop Defendant, they were watching for a traffic violation to further the investigation [*Id*. at 50]. He agreed that the officers would have stopped Defendant eventually based upon observing the video call in the Expo Center even if he did not commit a traffic violation [*Id*.].

Detective Parton said Defendant committed a traffic violation by cutting across the left turn lane, which is a public safety hazard [*Id*. at 51]. He agreed that the traffic light was green for Defendant to turn left if the roadway was clear [*Id*.]. Detective Parton did not recall whether Defendant's left turn affected the health and safety of anyone else on the highway, but it could have [*Id*. at 51–52]. He said to the best of his knowledge, no one was in the left turn lane [*Id*. at 52]. He stated that he was behind Defendant in the same lane [*Id*. at 53]. He believed Defendant did not activate his left turn signal because Defendant turned so abruptly [*Id*.].

Detective Parton stated that on the recording of the radio transmissions, Detective Pickett said Defendant "just brought food out," but he (Detective Parton) thought Detective Pickett was remarking on Defendant bringing food out of the Expo Center [*Id*. at 54]. To Detective Parton's recollection, Defendant entered the parking lot of Popeyes and immediately drove back out [*Id*. at 59]. He did not recall if the video recording of the search of the minivan showed a drink and box from Popeyes inside the van [*Id*. at 54]. He did not agree that if Defendant purchased food at Popeyes, it meant Defendant was not being evasive [*Id*. at 60]. Detective Parton said when

Defendant left Popeyes, he turned back onto Clinton Highway heading south [*Id.* at 55]. During that time, Defendant was driving fifteen miles per hour under the speed limit [*Id.*].

Detective Parton testified that Defendant violated Tennessee Code Annotated § 55-8-140 when the turned left onto Tillery Drive [*Id.*]. He said Defendant was stopped at the Shell station for that violation [*Id.* at 56]. He stated that Defendant did not receive a citation for the traffic violation because he was taken into custody for actions occurring afterward [*Id.*]. Detective Parton stated that the officers do not write citations after the person is taken into custody [*Id.*]. He stated that Defendant's left turn onto Tillery Drive was the only traffic violation he observed [*Id.* at 61]. He opined that traveling at thirty miles per hour in a forty-five-mile-per-hour zone is impeding the flow of traffic but said this occurred before he was directly behind Defendant [*Id.*].

Detective Parton stated that law enforcement followed Defendant for approximately two miles from the Expo Center to the turn onto Tillery Drive [*Id.* at 56–57]. He estimated only five minutes or less elapsed between Defendant leaving the Expo Center and him arriving directly behind Defendant's minivan [*Id.* at 57]. He stated that he was the only officer who saw Defendant turn left onto Tillery Drive [*Id.* at 58].

Detective Parton testified that when Officer Wiesenberg and Sergeant Geddings encountered Defendant at the Shell station, Defendant's minivan was stopped, and Defendant was sitting in the driver's seat [*Id.*]. He said he saw what occurred at the Shell station from an elevated position next door [*Id.* at 58].

On redirect examination, Detective Parton agreed that the improper lane change at Tillery Drive and Clinton Highway occurred after Defendant was at Popeyes [*Id.* at 62–63]. He agreed that he had previously stopped a vehicle for speeding even though no other cars were on the road [*Id.* at 63].

10

The Government also called Officer Robert Wiesenberg, who testified that he has worked for the KPD for six and one-half years [*Id*. at 64]. He has served on the Communications and Response Team, which combats violent crime, for two to three years [*Id*. at 64–65]. His duties involve complex investigations and targeted stops, which are stops conducted in collaboration with other units or jurisdictions [*Id*. at 65–66]. Officer Wiesenberg stated that he conducts traffic stops frequently and performs hundreds of traffic stops yearly [*Id*. at 66]. He stated that he takes safety precautions to combat the dangers associated with traffic stops and that he is trained in traffic stops, targeting violent crime, and gangs [*Id*. at 66–67]. He also participates in joint investigations [*Id*. at 67].

Officer Wiesenberg testified that on April 24, 2022, he was involved in a joint investigation, and his role was to conduct traffic stops of vehicles leaving a gun show at the Expo Center [*Id*. at 67–68]. He said he would look for a traffic violation to occur before stopping a vehicle [*Id*. at 68–69]. Officer Wiesenberg said law enforcement's goal was to stop vehicles away from the Expo Center so that individuals at the gun show would not realize they were under surveillance [*Id*. at 69]. He said law enforcement was concerned about crimes occurring at the gun show [*Id*.].

Officer Wiesenberg said the event on April 24, 2022, was the first gun show at which he had worked [*Id*. at 70]. He agreed that he received information from other officers during the investigation at the gun show, and all the officers in the investigation were using the same radio channel to communicate [*Id*. at 70, 72]. He was in a marked police vehicle and was stationed close by on the same side of the road as the Expo Center [*Id*. at 70]. Officer Wiesenberg said he relied on radio traffic to let him know to stop a vehicle leaving the Expo Center [*Id*. at 70–71]. He said once he located the vehicle, based on a description radioed to him, he would look for

11

suspicious behavior and potential traffic violations [*Id.* at 71]. Officer Wiesenberg said he was aware that undercover vehicles were also participating in the investigation and radioing information [*Id.*].

Officer Wiesenberg stated on April 24, 2022, he received a radio message to watch for a red Chrysler Town and Country van [*Id.*]. Based on the radio conversation, he expected that he would stop this van [*Id.* at 73]. Officer Wiesenberg testified about the video recording from his body camera [*Id.*; Exh. 5].[3] He said at 12:32 p.m. in the recording, he was attempting to catch up with the red Chrysler van, which had left the Expo Center [Doc. 54 p. 74; Exh. 5 at 12:32:57]. He activated his emergency lights briefly while passing through some intersections [Doc. 54 pp. 75–76; Exh. 5 at 12:33:17–24]. He stated that he was communicating with other officers by radio about the location of the van [Doc. 54 p. 76]. Officer Wiesenberg was notified over the radio that the van was by the front door of a Shell gas station [*Id.* at 78; Exh. 5 at 12:34:07]. He said he knew from the radio reports that the vehicle committed an illegal turn at Clinton Highway and Tillery Drive [Doc. 54 p. 78]. He said he drove to the Shell station to conduct a traffic stop of the van [*Id.*].

Officer Wiesenberg testified that he arrived at the Shell station and parked behind the van [*Id.* at 79; Exh. 5 at 12:35:28]. Sergeant Mike Geddings, who was also in a marked patrol car, arrived about the same time [Doc. 54 pp. 76, 79–80]. The video recording reveals that the van was parked with its passenger side along the curb of the building [Exh. 5 at 12:35:40]. Officer Wiesenberg said he spoke with the driver of the van and began the traffic stop [Doc. 54 p. 79; Exh. 5 at 12:35:43]. The video shows that Officer Wiesenberg told the driver, later identified as

---

[3]    Officer Wiesenberg stated that the recording from his body camera does not contain audio until thirty seconds before he activates his emergency lights [Doc. 54 pp. 74–75; Exh. 5 at 12:33:17]. Citations to Officer Wiesenberg's body camera are to the time stamp in the upper right corner of the recording [Exh. 5].

Defendant Michael Harris, that he was stopped because he made an illegal turn on Clinton Highway and Tillery Drive [Exh. 5 at 12:35:45–54].

The video shows that Defendant told Officer Wiesenberg that the van was a rental and handed the officer his driver's license [Exh. 5 at 12:35:58–12:36:04]. In response to Officer Wiesenberg's question whether Defendant had anyone with him, Defendant responded that his wife was with him and indicated that she was inside the gas station [Exh. 5 at 12:36:06–09]. Defendant also provided the rental paperwork [Exh. 5 at 12:36:26–27]. Inspecting Defendant's driver's license, Officer Wiesenberg asked if Defendant still lived in Detroit, and Defendant responded that he lived in Knoxville now [Doc. 54 p. 80; Exh. 5 at 12:36:31–35]. While Officer Wiesenberg prepared to write down Defendant's current address, Defendant informed him that he just came from the Expo Center [Doc. 54 pp. 80–81; Exh. 5 at 12:36:42–44]. Officer Wiesenberg asked what was going on there, and Defendant responded a gun show and that multiple officers were there [Doc. 54 p. 81; Exh. 5 at 12:36:44–55].

The video recording further shows that Defendant's wife returned to the car and stood in the open passenger-side doorway [Exh. 5 at 12:36:56]. Officer Wiesenberg took down Defendant's new address and his phone number [Exh. 5 at 12:37:04–28]. Officer Wiesenberg then told Defendant to wait, and he would return, before walking back to his patrol car [Exh. 5 at 12:37:35–12:38:10]. Officer Wiesenberg testified that at this point, Sergeant Geddings had gone inside the gas station to look for the passenger [Doc. 54 p. 83]. When Sergeant Geddings returned, Officer Wiesenberg told him that a "schedule VI odor," meaning the odor of marijuana, was coming from the van [Doc. 54 pp. 83–84; Exh. 5 at 12:38:15–18].

The video recording shows that Officer Wiesenberg returned to the minivan and told Defendant that he detected the odor of marijuana, which gave him probable cause to search the

vehicle [Exh. 5 at 12:40:35–45]. Defendant denied that either he or his wife had smoked in the van that day but agreed they had "probably" done so the day before [Exh. 5 at 12:40:55–12:41:01]. Officer Wiesenberg asked Defendant to get out of the van and whether any weapons were in the vehicle [Exh. 5 at 12:41:02–10]. Defendant responded affirmatively, stating "it's in a box in the back," but denied having weapons on his person [Exh. 5 at 12:41:10–11]. Officer Wiesenberg frisked Defendant [Exh. 5 at 12:41:16–21]. Defendant consented to Officer Wiesenberg reaching inside his pockets, and the officer removed two cellphones, a wallet, and three bundles of currency from Defendant's pockets [Doc. 54 p. 84, 86–87; Exh. 5 at 12:41:23–41]. Officer Wiesenberg testified that based upon his training and experience, Defendant's possession of two cellphones along with the odor of marijuana indicated drug trafficking [Doc. 54 pp. 84–85]. He also stated that the amount of currency and how it was packaged suggested drug trafficking [*Id.* at 87].

Officer Wiesenberg stated that Defendant was then asked to stand away from the van by the hood of his patrol car while the officers searched the van [*Id.* at 86; Exh. 5 at 12:41:40–42]. The video reveals that Sergeant Geddings began searching the front passenger area, and Officer Wiesenberg searched around and under the front driver's seat [Exh. 5 at 12:41:44–12:42:15]. Officer Wiesenberg found a pink marijuana grinder and ammunition in the front console [Doc. 54 pp. 87–88; Exh. 5 at 12:43:10–40]. Officer Wiesenberg testified that while he and Sergeant Geddings searched the van, Defendant was standing by the hood of his patrol car with a uniformed officer and undercover officers nearby [Doc. 54 pp. 88–89; Exh. 5 at 12:42:23]. Officer Wiesenberg stated that he next began searching the trunk of the van, while Sergeant Geddings searched the middle passenger compartment [Doc. 54 pp. 89–90; Exh. 5 at 12:44:36]. He removed a pink or purple suitcase from the van and placed it on the sidewalk to search it

[Doc. 54 p. 91; Exh. 5 at 12:46:51–12:47:15]. Officer Wiesenberg stated that as he began to search the suitcase, Defendant walked toward the van, quickly entered the driver's seat, and drove away [Doc. 54 pp. 91–92].

Officer Wiesenberg testified that after Defendant fled the gas station, he detained the passenger, secured items seized from the van, and collected the suitcase along with a taser and body camera that had been dropped on the ground [Doc. 54 pp. 92–95]. Officer Wiesenberg later went to the scene of the crash, where he realized Sergeant Geddings had been inside the van when Defendant fled [*Id*. at 95, 99].[4] Officer Wiesenberg completed the search of the minivan and the suitcase, which he brought to the crash scene, and seized a large bag of methamphetamine from the suitcase [Doc. 54 pp. 95–96, 98, 101–02, 104–05]. Officers also seized firearms and firearm accessories from the van [*Id*. at 103].

On cross examination, Officer Wiesenberg testified that on the day of the stop, he was stationed next door to the Expo Center in a marked police car [*Id*. at 112]. He agreed that he was located away from the Expo Center so that customers at the gun show would not notice the police presence [*Id*. at 113]. His role was to attempt to stop vehicles targeted by other officers [*Id*.]. He explained that before officers stopped a targeted vehicle, the vehicle would have to commit a traffic violation observed by an officer [*Id*.]. He agreed that he did not observe Defendant Harris commit a traffic violation [*Id*. at 113–14]. Officer Wiesenberg said he was following Defendant's vehicle, when Defendant turned into a restaurant, and he drove past the restaurant [*Id*. at 114]. He said that he turned onto a side road, and an undercover officer followed behind Defendant once Defendant returned to the highway [*Id*.]. He said if Defendant had not committed a traffic violation, the officers would have discontinued surveillance and

---

[4]     Officer Wiesenberg also testified about Sergeant Geddings's body camera footage [Doc. 54 pp. 106–110; Exh. 6].

15

returned to the Expo Center [*Id*. at 115–16]. He agreed that a traffic violation alone would not have given probable cause to search the vehicle [*Id*. at 116].

Officer Wiesenberg stated that he conducted the traffic stop of Defendant based upon a traffic violation observed by another officer and reported over the radio [*Id*.]. He said that another officer radioed that Defendant's vehicle made an illegal turn at Clinton Highway and Tillery Drive [*Id*. at 117]. He agreed that at the time he made the stop, he did not know how the turn was illegal [*Id*.]. He also agreed that none of the other officers told him that Defendant's turn compromised the health or safety of the traveling public [*Id*. at 125]. Officer Wiesenberg stated that if he had written a citation for the traffic violation, he would have listed the officer who observed the violation as a witness [*Id*. at 130]. Officer Wiesenberg agreed that as he began the traffic stop, Defendant was cooperative, answered questions, and provided the requested information, including information on his passenger [*Id*. at 118].

Officer Wiesenberg confirmed that although he told Sergeant Geddings that he detected the odor of marijuana, Sergeant Geddings did not say he also smelled marijuana while around the vehicle even though he searched the mid-section of the van [*Id*. at 119]. Nor did any other officer state that he smelled marijuana in the van [*Id*. at 126]. Officer Wiesenberg said he was approximately one arm-length from the van's open window when he noticed the odor of marijuana [*Id*. at 120]. He said he did not notice the odor of marijuana when he got out of his patrol car, but as he approached Defendant's vehicle, he noticed "a strong odor" of marijuana [*Id*.]. He agreed that he did not mention the odor of marijuana to Defendant when he first noticed it because he was waiting to discuss the next steps with Sergeant Geddings [*Id*. at 120–21]. He agreed that he could not tell whether the odor of marijuana came from the car's interior or

Defendant's clothing or whether the passenger caused the odor of marijuana to be in the vehicle [*Id*. at 122].

Officer Wiesenberg stated he later verified that the odor of marijuana when Defendant said that he and his passenger had smoked marijuana in the car the day before [*Id*. at 127]. He agreed that he could not distinguish the odor of marijuana from the odor of hemp [*Id*. at 128]. Officer Wiesenberg further agreed that raw marijuana has a different odor from burned marijuana [*Id*. at 131]. He said that the odor coming from Defendant's vehicle "was more of the burnt smell" [*Id*.]. He stated that he found a marijuana grinder in the van but denied finding any marijuana "buds" in the ashtray [*Id*. at 132].

Officer Wiesenberg said he searched the vehicle based upon the odor of marijuana from within [*Id*. at 123]. He agreed that he did not search based upon the cellphones or money seized from Defendant's person, although those items were evidence that Defendant may be engaged in drug trafficking [*Id*. at 123–25]. Officer Wiesenberg agreed that Defendant gave consent to search his pockets but not consent to search the vehicle [*Id*. at 125]. He said he did not need Defendant's consent to search the van because he had probable cause to search it [*Id*.].

Officer Wiesenberg testified that he asked Defendant to get out of the van and to stand in front of his patrol car [*Id*. at 126]. He agreed that at this point, Defendant was not under arrest but was not free to leave [*Id*.]. After reviewing a portion of the video recording from his body camera [Exh. 5 at 12:43:06–08], Officer Wiesenberg testified that he did not recognize a Popeyes cup inside the vehicle [*Id*. at 122].[5] He also reviewed a portion of the video from Sergeant Geddings's body camera [Exh. 6 at 12:42:26] and identified a bag of food on the back bench seat

---

[5]     A later segment of the video shows that the cup in the rear of the console closer to the middle of the minivan is a Popeyes cup [Exh. 5 at 12:44:00–25].

of the van, but he did not know if it was from Popeyes [*Id.* at 128–29].[6] Officer Wiesenberg stated that when he opened the suitcase at the gas station, a plastic bag inside the suitcase was in plain view, but he did not recognize the contents of the plastic bag due the other events occurring at that time [*Id.* at 126–27].

On redirect examination, Officer Wiesenberg stated that he heard on the designated radio channel, communications about a Chrysler minivan making an illegal turn [*Id.* at 132–33]. He said when he first approached Defendant's window, when Defendant was inside the vehicle, he smelled the odor of burnt marijuana [*Id.* at 133]. He agreed that he subsequently asked Defendant if he had smoked in the car, and Defendant said he had smoked the day before [*Id.* at 133–34].

At the conclusion of the testimony, the Government proffered a *Miranda* rights waiver signed by Defendant Harris on April 24, 2022, at 2:17 p.m. [Exh. 7]. AUSA Svolto also introduced the Criminal Complaint and supporting affidavit by Special ATF Agent Tyler Kilday, outlining the events of April 24, 2022, and listing the items seized from Defendant's vehicle [Exh. 8]. The affidavit states that officers seized nearly one kilogram of methamphetamine, fifteen grams of marijuana, 2.4 grams of suspected heroin, two firearms, ammunition, $7,000, and firearms accessories [Doc. 54 pp. 135–36; Exh. 8 ¶ 22]. Following his arrest, Defendant was transported to the KPD office, was interviewed, and admitted to law enforcement that he had marijuana and had purchased firearms [Doc. 54 pp. 135–36; Exh. 8].

At the defense counsel's request, the Court permitted post-hearing briefs [Doc. 54 pp. 136–37]. Defendant filed his post-hearing brief on July 21, 2023 [Doc. 53]. The Government

---

[6]      The video recording from Officer Geddings's body camera shows a Food City bag that appears to contain a Styrofoam food container on the front passenger's seat secured with the seatbelt [Exh. 6 at 12:41:44]. Although Sergeant Geddings picks up the bag on the bench seat and opens it, the contents are not visible due to the camera angle [Exh. 6 at 12:46:17–35].

18

filed a responding brief on August 1, 2023 [Doc. 57]. Defendant filed a reply on August 14, 2023 [Doc. 60]. Upon receiving all post-hearing filings, the undersigned took the matter under advisement.

## II.    FINDINGS OF FACT[7]

On April 24, 2022, the KCSO, KPD, and ATF conducted a joint investigation into illegal firearms sales at a gun show at the Knoxville Expo Center. Undercover officers conducted surveillance inside the Expo Center. Other undercover officers in unmarked vehicles conducted surveillance in the parking lot and were tasked with following individuals leaving the Expo Center. Uniformed officers in marked police vehicles waited near the Expo Center to stop individuals after they left the Expo Center, as directed by other officers over the radio. All law enforcement communicated on a designated radio channel.

Officers inside the Expo Center observed a black male wearing red shorts and a red ball cap walking from booth to booth while on a video call with a third party on his cell phone. Undercover officers overheard portions of the conversations in which the male described and showed firearms and accessories to the person with whom he was speaking. The individual purchased several firearms and accessories from different vendors. Undercover officers observed the male as he made several trips to his red Chrysler minivan to load firearms and accessories purchased at the gun show. Officers inside the Expo Center radioed a description of the male and information that he was communicating with another person on FaceTime while shopping for firearms. KCSO Detective Christian Picket, who was driving an unmarked black pickup truck, followed the minivan out of the parking lot and on Clinton Highway. KPD Officer Robert

---

[7]    This section sets forth general factual findings based upon the testimony and exhibits presented at the evidentiary hearing. Additional factual findings are set forth in connection with the analysis below.

Wiesenberg who was in a marked patrol car also began following the minivan to stop it if a traffic violation was observed. A check of the minivan's Florida license tag revealed it was a rental vehicle.

The minivan turned into a Popeyes restaurant, and both the marked patrol car and Detective Pickett drove past the Popeyes. Radio transmissions stated the minivan was in the drive thru and that the driver had already brought food out. Within five minutes of the minivan leaving the Expo Center, KCSO Detective Marcus Parton, who was in an unmarked vehicle, saw the minivan exit the Popeyes and resume traveling south on Clinton Highway. Detective Parton believed the minivan had gone to Popeyes to evade law enforcement. Detective Parton followed the minivan as it approached the interstate entrance ramp. When the traffic light at the intersection of Clinton Highway and Tillery Drive turned green, the minivan made an abrupt left turn from the center lane, cutting across the turn lane and onto Tillery Drive, from which it immediately turned left onto Schubert Road. The minivan then drove north on Schubert Road, which runs parallel to Clinton Highway. Detective Parton radioed that the minivan had made an illegal turn onto Tillery Drive and that it was now traveling north on a road parallel to Clinton Highway. Detective Parton lost sight of the minivan at this point.

A short time later, undercover officers located the minivan, followed it to a Shell gas station, and saw it park by the curb. Officer Wiesenberg and Sergeant Geddings both traveled to the gas station in their marked vehicles, arriving at approximately the same time, which was one and one-half minutes after they received the radio transmission of the minivan's location. Officer Wiesenberg approached the minivan, where a black male was seated in the driver's seat. When Officer Wiesenberg drew close to the open window, he smelled the odor of marijuana coming from the minivan. Officer Wiesenberg told the driver, whom he identified as Michael Harris, that

20

he was stopping him for a traffic violation, specifically an illegal turn at Clinton Highway and Tillery Drive. Defendant produced his Michigan driver's license and rental paperwork for the minivan at the officer's request. Defendant told Officer Wiesenberg that he now lived in Knoxville and gave his address. Defendant also volunteered that he had come from the gun show at the Expo Center and had noticed multiple officers there. Officer Wiesenberg took Defendant's license and the paperwork and stood by his patrol car to regroup with Sergeant Geddings, who had gone into the gas station to look for the passenger.

Officer Wiesenberg informed Sergeant Geddings of the odor of marijuana coming from the minivan and told Geddings he planned to remove Defendant and search the vehicle. Officer Wiesenberg returned to the minivan and told Defendant he planned to search the vehicle due to the odor of marijuana. Upon inquiry from Officer Wiesenberg, Defendant denied that he or his passenger had smoked marijuana in the minivan that day but stated they had probably smoked the previous day. Defendant confirmed he had a weapon in a box in the back of the minivan but denied having any weapons on his person. Officer Wiesenberg asked Defendant to get out of the minivan and frisked him. He then asked for consent to search inside Defendant's pockets. Defendant agreed the officer could search inside his pockets, and Officer Wiesenberg removed a wallet, two cell phones, and three bundles of currency from Defendant's pockets. Officer Wiesenberg then asked Defendant to stand at the front of his patrol car while he and Sergeant Geddings searched the minivan.

During the search, Officer Wiesenberg found ammunition in the front center console and a marijuana grinder in the lower center console on the floorboard between the front seats. The console also contained two plain white Styrofoam cups in the front drink holders between the driver's and passenger's seats and a Popeyes cup in the drink holder at the back of the console

near the middle of the minivan. Officer Wiesenberg began searching the trunk while Sergeant Geddings searched the middle passenger area of the minivan. A Food City bag holding a Styrofoam food container was secured on the front passenger's seat with the seat belt, and another plastic bag of food was on the back bench seat.

Officer Wiesenberg seized firearms and firearm accessories from the trunk. He removed a pink suitcase from the trunk, placed it on the sidewalk beside the minivan, and opened it to begin searching. At that point, Defendant got in the van, fled the scene of the stop, and subsequently crashed into two vehicles a short distance from the gas station. Officer Wiesenberg detained the passenger, collected a taser and body camera dropped at the scene, and placed all the items taken from the minivan, including the suitcase, in his patrol car, before driving to the scene of the crash. Officer Wiesenberg completed the search of the suitcase at the crash scene and located a plastic bag containing methamphetamine.

## III. ANALYSIS

The Fourth Amendment protects citizens against unreasonable searches or seizures. U.S. Const. amend IV. Defendant Harris argues that law enforcement violated his rights under the Fourth Amendment because the officers lacked probable cause to stop him for a traffic violation or reasonable suspicion to conduct an investigatory stop. He contends that his detention on the scene exceeded the scope of a traffic stop and constituted an arrest without probable cause. He also maintains that the officer improperly frisked him because the officer lacked a reasonable belief that he was armed and dangerous. Finally, Defendant asserts that the officers conducted a warrantless search of his vehicle without probable cause.

For the reasons set forth below, the undersigned finds officers properly stopped the minivan for a traffic violation. The officers also had reasonable suspicion to conduct an

22

investigatory stop and reasonable suspicion to frisk Defendant, who was detained during the traffic investigation and subsequent search. Finally, the officers had probable cause to search Defendant's vehicle after smelling the odor of marijuana.

### A. Stop of the Minivan

Defendant argues that law enforcement had neither probable cause nor reasonable suspicion to stop him [Doc. 46 pp. 1–2, 5; Doc. 48 p. 2; Doc. 53 p. 5–6]. If an "officer has probable cause to believe that a traffic violation has occurred or was occurring, the resulting stop is not unlawful and does not violate the Fourth Amendment." *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993). To determine whether a traffic stop is an unreasonable seizure in violation of the Fourth Amendment, the Court objectively evaluates the officer's conduct in light of the surrounding circumstances known to the officer. *Id.* at 388; *see Wren v. United States*, 517 U.S. 806, 810 (1996). Probable cause is "reasonable grounds for belief supported by less than prima facie proof but more than mere suspicion." *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990) (citation omitted). In other words, probable cause means a substantial chance or likelihood of criminal conduct. *Ferguson*, 8 F.3d at 392 (citing *Illinois v. Gates*, 462 U.S. 213, 244 n.13 (1983)).

Detective Parton testified that he observed Defendant's minivan turn left from a "straight-only" lane without signaling and abruptly travel across the turn-only lane onto Tillery Drive. Detective Parton radioed that the minivan made an illegal left turn onto Tillery Drive. Officer Wiesenberg received that radio transmission and conducted a traffic stop of the minivan shortly thereafter as it was parked at a gas station. Defendant argues that his left turn onto Tillery Drive did not violate any traffic law because it did not endanger other motorists [Doc. 53 p. 7]. He also asserts that Detective Parton's testimony regarding the alleged traffic violation is not credible

and that the officers would have stopped him without regard to any traffic violation [*Id.* at 2–3, 7; Doc. 60 pp. 1–3].

Under Tennessee law, "[w]here a special lane for making left turns by drivers proceeding in opposite directions has been established[, a] left turn shall not be made from any other lane unless a vehicle cannot safely enter the turn lane[.]" Tenn. Code Ann. 55-8-140(5)(A). Detective Parton observed Defendant turn left from a lane other than the designated turn lane, committing a violation of § 55-8-140(5)(A).

Defendant argues that his conduct did not constitute an improper turn from a straight-only lane because he did not impede traffic or endanger any other vehicle [Doc. 53 pp. 3–4]. Defendant, however, submits no case law interpreting § 55-8-140(5) to include that consideration, and the statute is silent in this regard.[8] *See generally United States v. Brown*, No. 1:07-CR-9, 2007 WL 1345463, at *3, *7 (E.D. Tenn. May 7, 2007) (affirming magistrate judge's determination that defendant committed a violation of Tenn. Code Ann. § 55-8-140(5)(D), improper use of a turn lane, where attached report and recommendation contains no mention of risk to other motorists); *accord United States v. Carter*, No. 4:17-cr-11-TRM-SKL, 2017 WL 8895627, at *6 (E.D. Tenn. Dec. 29, 2017) (explaining that violation of Tenn. Code Ann. § 55-8-123(1) for crossing over a fog line does not take into consideration "whether an actual danger is thereby created"). Moreover, as noted by the Government [Doc. 57 pp. 5–6], Detective Parton testified that Defendant's left turn from the straight-only lane was dangerous and he did not follow Defendant through the turn because he did not believe it was safe to do so.

---

[8]    Defendant argues that whether other motorists were endangered is a proper consideration for changing lanes without signaling in violation of Tenn. Code Ann. § 55-8-143(a) [Doc. 43 p. 3; Doc. 53 p. 6–7]. That, however, is not the violation under consideration here.

24

Defendant also argues that Detective Parton's testimony about the illegal left turn is not credible because the Government presented no video confirmation of his testimony from a dash camera or traffic camera [Doc. 53 p. 3]. This argument is equally unavailing. Detective Parton testified that he did not have a body camera or dash camera that day because he was undercover and in an unmarked vehicle. At the time Defendant made the illegal left turn, Detective Parton appears to have been the only officer observing Defendant. Detective Parton's description of the illegal left turn is corroborated by his radio transmission made immediately after observing Defendant make the turn. Accordingly, the undersigned credits Detective Parton's testimony that he witnessed Defendant commit a traffic violation.

Defendant next argues that the officers conducting the traffic stop did not witness the alleged traffic violation and, thus, did not have probable cause. [Doc. 53 p. 9]. But the "collective knowledge doctrine" permits an officer to stop an individual based upon information from another officer. *United States v. Lyons*, 687 F.3d 754, 765–66 (6th Cir. 2012). "Whether conveyed by police bulletin or dispatch, direct communication or indirect communication, the collective knowledge doctrine may apply whenever a responding officer executes a stop at the request of an officer who possesses the facts necessary to establish reasonable suspicion[,]" *id*. (footnote and citation omitted), or probable cause, *United States v. Kendricks*, 127 F. App'x 836, 843 (6th Cir. 2005) (citations omitted). Here, Officer Wiesenberg testified he received Detective Parton's radio transmission that the red Chrysler minivan made an illegal left turn from Clinton Highway onto Tillery Drive. Thus, Officer Wiesenberg had probable cause to stop Defendant for the illegal left turn observed by Detective Parton based upon the collective knowledge doctrine.

Finally, the probable cause from Detective Parton's observation and conveyed to Officer Wiesenberg was not stale. Detective Parton testified that he pulled behind Defendant as

25

Defendant exited the Popeyes parking lot within five minutes of Defendant leaving the Expo Center. After committing the traffic violation, Defendant began traveling north back toward the Expo Center. Law enforcement located Defendant at a Shell station two miles north of the Expo Center. Officer Wiesenberg's body camera reveals that he arrived at the Shell station one and one-half minutes after officers radioed that the minivan was there. This chronology demonstrates that Officer Wiesenberg stopped Defendant within a reasonable time after Detective Parton observed the illegal turn. *See United States v. Copeland*, 321 F.3d 582, 594 (6th Cir. 2003) (determining that stop of defendants one mile from site of parking violation, after they returned to their vehicle and drove away, was reasonable). Moreover, a stop based on probable cause that a traffic violation has occurred is reasonable, without regard to the officer's subjective motives. *Ferguson*, 8 F.3d at 391; *see also United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008) ("When a traffic stop is supported by probable cause, an officer's subjective intent is irrelevant." (citing *Whren*, 517 U.S. at 813)).

Defendant also argues that the stop was unconstitutional because the officers lacked reasonable suspicion that he committed a crime [Doc. 60 pp. 1–3].[9] Law enforcement may temporarily seize a person or vehicle and, thus, conduct an investigatory or *Terry* stop, if the officer has "reasonable suspicion" of criminal activity stemming from "specific and articulable" facts which the officer knew at the time of the seizure. *Terry v. Ohio*, 392 U.S. 1, 21–22, 27 (1968); *United States v. Bentley*, 29 F.3d 1073, 1075 (6th Cir. 1994); *see also United States v. Simpson*, 520 F.3d 531, 541 (6th Cir. 2008) ("[A] seizure for an ongoing violation of any crime—no matter how minor—is governed by the standard of reasonable suspicion, not probable

---

[9]     Because the undersigned has found Defendant was properly stopped based upon probable cause, this issue need only brief discussion. *See United States v. Stevenson*, 43 F.4th 641, 645 (6th Cir. 2022) ("[W]here an officer possesses probable cause, he necessarily possesses reasonable suspicion." (citation omitted)).

26

cause." (footnote omitted)). Reasonable suspicion is a quantum of proof that is "considerably less" than a preponderance of the evidence, *United States v. Sokolow*, 490 U.S. 1, 7 (1989), and is not difficult to establish, *United States v. McAllister*, 39 F.4th 368, 373–74 (6th Cir. 2022) (explaining the standard for reasonable suspicion is "quite low").

At the time Officer Wiesenberg approached Defendant at the gas station, he knew that law enforcement suspected Defendant of engaging in illegal firearms purchases based upon undercover officers observing him moving from booth to booth at the gun show, while describing the wares to a third party via FaceTime. Defendant argues that the reasonable suspicion determination is limited to this factor, the color of Defendant's clothing, and his race [Doc. 60 pp. 1–2]. The Court, however, must consider the totality of the circumstances known at the time of the stop. *United States v. Bridges*, 626 F. App'x 620, 623 (6th Cir. 2015) (holding that whether an officer had reasonable suspicion turns upon the totality of circumstance at the time of the seizure). In addition to Defendant's use of FaceTime while shopping, undercover officers saw Defendant purchase multiple firearms and accessories and load them in his minivan. Upon following Defendant from the Expo Center, officers observed Defendant take actions that seemed designed to evade law enforcement such as driving through the Popeyes parking lot and proceeding in the same direction[10] and making an abrupt and illegal left turn from the wrong lane

---

[10]   Defendant argues that the radio transmissions and the video from Officer Wiesenberg's body camera reveal that Defendant got food at Popeyes [Doc. 53 p. 3]. Detective Parton testified that he interpreted an officer's remark about food on the radio channel to be a reference to Defendant having already obtained food at the Expo Center. The video recordings of the search of the minivan bear this out. Although the video recording shows a Popeyes cup in the back of the console, it also shows two plain Styrofoam cups filled with liquid in the front of the console. A Food City bag containing what appears to be a Styrofoam food container was in the passenger seat, and a second bag of food, for which the origin is not clear, was on the rear bench seat. Regardless of whether Defendant got food at Popeyes, Detective Parton reasonably interpreted Defendant's quick detour through the restaurant's parking lot to be an attempt to evade law enforcement.

27

of travel. Detective Parton testified that based upon his training and experience video chatting at a gun show and counter surveillance techniques are both red flags for conducting illegal straw firearms purchases. Officers checked the minivan's Florida license tag number and learned the minivan was a rental vehicle. The totality of these specific and articulable facts likely also provided reasonable suspicion for the officers to believe Defendant was engaged in illegal firearms purchases.

In summary, Officer Wiesenberg had probable cause through the collective knowledge doctrine to believe Defendant made an illegal left turn. Alternatively, law enforcement had reasonable suspicion to believe Defendant was engaged in illegal firearms purchases. Thus, his stop of Defendant at the gas station comports with the Fourth Amendment.

## B.     Seizure and Frisk of Defendant

Defendant argues that the detention and frisk of his person at the gas station amounted to an arrest without probable cause and an improper search for weapons [Doc. 46 pp. 2, 5; Doc. 53 p. 6]. Defendant asserts that he was immediately arrested at the inception of the traffic stop [Doc. 46 p. 3; Doc. 48 p. 2;[11] Doc. 53 p. 8[12]]. He asserts that, at that time, the officers lacked probable cause to believe he had committed any crime [Doc. 46 p. 3; Doc. 53 p. 8]. Defendant also contends that he was frisked without a reasonable belief that he was armed and dangerous [Doc. 46 p. 5].

---

[11]     In his opening reply brief, Defendant contends that the officers "blocked his vehicle in a parking space at the Shell gas station" [Doc. 48 p. 2]. To the contrary, Defendant could and did leave by driving forward out of the gas station. Although Defendant filed his reply brief before the evidentiary hearing, evidence of Defendant fleeing the traffic stop was presented at his detention hearing on June 2, 2022 [*See* Docs. 25, Minutes, & 26, Exhibit List].

[12]     In his post-hearing brief, Defendant tempers his argument somewhat, stating that all the officers' actions after receiving his driver's license and the rental paperwork violated his constitutional rights [Doc. 53 p. 8].

28

"Fourth Amendment search and seizure analysis unfurls chronologically, and 'a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution.'" *United States v. Lott*, 954 F.3d 919, 923 (6th Cir. 2020) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). A traffic stop, like an investigatory stop, must be "limited in [both] scope and duration." *Id.* (citation omitted and alteration in original) (observing that a traffic stop is analyzed like a *Terry* stop); *see also Hernandez v. Boles*, 949 F.3d 251, 256 (6th Cir. 2020) (finding that the length of the traffic stop must not extend beyond the time needed to perform the tasks associated with it); *United States v. Lang*, No. 22-35-DLB-CJS, 2023 WL 358242, at *5–7 (E.D. Ky. Jan. 23, 2023) (finding that removal of passenger from vehicle for reason other than officer safety exceeded the scope of a traffic stop). The officer can permissibly extend the length or enlarge the scope of a traffic stop "if 'something happened *during the stop* to cause the officer to have a reasonable and articulable suspicion that criminal activity is afoot.'" *Lott*, 954 F.3d at 923 (quoting *United States v. Stepp*, 680 F.3d 651, 661 (6th Cir. 2012)).

Defendant argues that he was immediately arrested and searched upon the officers' arrival on the scene. That a motorist is not free to leave the scene of a traffic stop, however, does not constitute an arrest. Indeed, an individual subject to a traffic stop is not free to leave. *See United States v. Nobel*, 762 F.3d 509, 521 (6th Cir. 2014) ("Most traffic stops represent a minor inconvenience to the vehicle's occupants[.]" (citation omitted)); *see also Berkemer v. McCarty*, 468 U.S. 420, 436–37 (observing a traffic stop is a seizure despite its purpose being "'limited and the resulting detention quite brief'" (citation omitted)). And after lawfully stopping a vehicle for a traffic offense, the officer may order the driver to exit the vehicle. *United States v. Bonilla*, 357 F. App'x 693, 696 (6th Cir. 2009) (citation omitted). Here, Defendant was detained, not

29

arrested, while the officers conducted the traffic stop. Although his movements were limited, he was not restrained and was allowed to continue sitting in his vehicle initially and, thereafter, asked to exit and stand by a patrol car a short distance away.

Defendant also challenges the frisk of his person after he exited the minivan. An officer may frisk a driver if he or she has reasonable suspicion that the person may be armed and dangerous. *Nobel*, 762 F.3d at 521 (citation omitted). Reasonable suspicion to frisk is an objective standard, and it exists if, based upon the totality of the circumstances "a reasonably prudent [person] in the circumstances would be warranted in the belief that his [or her] safety or that of others was in danger[.]'" *Id*. at 521–22 (quoting *Terry*, 392 U.S. at 27) (first and second alteration in original). The proof shows that Officer Wiesenberg knew Defendant had just come from a gun show (a fact confirmed by Defendant) where officers observed him purchase multiple weapons. Defendant told Officer Wiesenberg that he had a firearm in a box in the back of the minivan. Officer Wiesenberg also knew Defendant had taken suspected evasive maneuvers to shake off police surveillance. While simply seeking to avoid an encounter with law enforcement is not suspicious, evasive maneuvers and flight from police can contribute to suspicion. *See United States v. Edwards*, No. 1:11–CR–110, 2011 WL 6934489, *5–7 (S.D. Ohio Dec. 30, 2011) (analyzing cases and observing "the fact that the defendant fled from the officer was of key importance to the Sixth Circuit's conclusion that the officer had reasonable suspicion to make a *Terry* stop"). Additionally, Officer Wiesenberg's and Sergeant Geddings's attention would be focused away from Defendant and on the vehicle during the search. For these reasons,

30

Officer Wiesenberg could properly frisk Defendant to ensure his safety and the safety of Sergeant Geddings during the search.[13]

Finally, Defendant argues the officers exceeded the scope of the traffic stop by continuing to detain him after receiving his driver's license and rental paperwork [Doc. 53 pp. 8–9]. He asserts the officers' intention was to search his vehicle for his gun show purchases [*Id.* at 2]. In support of his position, Defendant argues that the officers never issued a traffic citation for the alleged illegal turn [Doc. 48 p. 2]. An officer may not extend a traffic stop beyond the time necessary to perform the tasks attendant thereto unless the officer obtains reasonable suspicion to justify extending the detention. *United States v. Torres-Ramos*, 536 F.3d 542, 550 (6th Cir. 2008). Here, as soon as Officer Wiesenberg began the traffic stop, he smelled the odor of marijuana, which provided reasonable suspicion to continue to detain Defendant during the search of his vehicle. *United States v. Monroe*, No. 17-20025-SHM-dkv, 2017 WL 9604648, *6 (W.D. Tenn. Nov. 30, 2017) ("The odor of marijuana provides reasonable suspicion to further detain a vehicle after the purpose of a traffic stop has ceased." (citing *Simpson*, 520 F.3d at 543), *report & recommendation adopted by* 2018 WL 2074201 (W.D. Tenn. May 1, 2018).

In sum, the undersigned finds the officers properly required Defendant to exit his vehicle, frisked him for officer safety, and detained him by the patrol car while they searched the minivan.

### C. Search of Minivan

Defendant also argues that the officers lacked any basis to search his vehicle [Doc. 46 p. 5; Doc. 53 p. 5]. He asserts that Officer Wiesenberg's testimony that he smelled the odor of

---

[13] Officer Wiesenberg also searched inside Defendant's pockets pursuant to his consent. Defendant does not challenge that he gave consent to search his pockets.

burnt marijuana coming from the minivan was not corroborated by Sergeant Geddings and is not credible [Doc. 53 pp. 4–5].[14] Moreover, he contends that Officer Wiesenberg went directly to search the rear of the vehicle, where Defendant had placed his gun show purchases, showing that he was not searching for marijuana [Doc. 48 pp. 2–3]. Finally, he argues that no exigent circumstances prevented the officers from getting a search warrant for his vehicle [*Id.* at 5-6].

An officer's "detection of [the] odor [of marijuana], by itself, is sufficient to provide probable cause to conduct a lawful search of a vehicle." *United States v. Crumb*, 287 F. App'x 511, 514 (6th Cir. 2008) (collecting cases); *United States v. Elkins*, 300 F.3d 638, 659 (6th Cir. 2002) ("[A]n officer's detection of the smell of marijuana in an automobile can by itself establish probable cause for a search." (citation omitted)). Officer Wiesenberg testified that when he approached the lowered window of the minivan, he smelled the odor of burnt marijuana. "[T]he Sixth Circuit does not require an officer marijuana claiming to have smelled burnt marijuana to show that he had particular training and experience in detecting marijuana." *United States v. Matthews*, 422 F. Supp. 3d 1235, 1246 (W.D. Ky. 2019) (citing *United States v. McCaster*, 466 F. App'x 443, 446 (6th Cir. 2011)).

Officer Wiesenberg's testimony that he smelled the odor of marijuana coming from the vehicle is corroborated by the video recording from his body camera on which he tells Sergeant Geddings that he smelled a "section VI odor" while talking with Defendant at the window of the

---

[14]     Defendant also asserts that the search of his vehicle violated Article I § 7 of the Tennessee Constitution, which prohibits unreasonable searches and seizures and general warrants [Doc. 43 p. 4]. The exclusionary rule, however, only requires the exclusion of evidence seized in violation of the federal Constitution. *United States v. Robbins*, No. 3:05-CR-32, 2006 WL 2323315, *14 n.1 (E.D. Tenn. Aug. 9, 2006) (citing *United States v. Wright*, 16 F.3d 1429, 1434 (6th Cir. 1994)) (accepting report and recommendation in whole). "The fact that Tennessee law 'may . . . require greater protection against searches and seizures than the fourteenth amendment is of no avail to a defendant in federal court, under prosecution for a federal crime.'" *Wright*, 16 F.3d at 1434 (quoting *United States v. Loggins*, 777 F.2d 336, 338 (6th Cir. 1985)).

minivan. This testimony is also corroborated by Defendant's admission to Officer Wiesenberg that he and/or his passenger "probably" smoked marijuana in the vehicle the day before. The undersigned finds Officer Wiesenberg's testimony to be credible. *C.f. Monroe*, 2017 WL 9604648, *21–22 (finding officers' testimony that they smelled marijuana during traffic stop was undermined by their failure to contemporaneously mention the odor on the scene or in their affidavit of complaint or incident report).

But Defendant maintains that Officer Wiesenberg was not searching for marijuana because he began searching the minivan at the trunk [Doc. 48 pp. 2–4]. This assertion is contradicted by the video recording, which shows Officer Wiesenberg first searched the area of the driver's seat and console while Sergeant Geddings searched the front passenger's seat. Moreover, the odor of marijuana gave the officers probable cause to search the entire vehicle and any containers therein. *Matthews*, 422 F. Supp. 3d at 1245 (holding odor of marijuana and observation of blunt gave probable cause to search "entire vehicle"); *see also United States v. Ross*, 456 U.S. 798, 825 (1982) ("[I]f probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search."); *United States v. Bailey*, 407 F. App'x 27, 28–29 (6th Cir. 2011) (holding odor of marijuana provided probable cause to search vehicle and, upon finding of marijuana on the floorboard, officers had "more than enough probable cause to justify a search of the entire vehicle, including the trunk" (citations omitted)); *United States v. Burnett*, 791 F.2d 64, 67 (6th Cir. 1986) (holding the legal seizure of a package of marijuana from the vehicle's floorboard gave the officer "every right to search the passenger area of the car, the trunk, and any and all containers which might conceal contraband").

33

Defendant asserts the officers' initial search of the front passenger compartment did not reveal any marijuana; however, Officer Wiesenberg located a marijuana grinder in the front console. He also seized two cellphones and three bundles of currency from Defendant's pockets just before beginning the search. Thus, the officers had probable cause to search the entire minivan.

Relying on *United States v. Chambers* and *United States v. Rohrig*, Defendant argues that no exigent circumstances were present that prevented the officers from waiting to search his vehicle until they obtained a search warrant [Doc. 48 pp. 5–6]. *See* 395 F.3d 563, 565 (6th Cir. 2005), *abrogated by Kentucky v. King*, 563 U.S. 452, 464 (2011) (looking to objective factors, rather than the officer's subjective intent, for presence of exigent circumstances justifying a warrantless search of a residence); 98 F.3d 1506, 1515 (6th Cir. 1996) (observing that the warrantless entry into a residence is "presumptively unreasonable" (citation omitted)). But the cases cited by Defendant address the warrantless search of a home. In contrast, officers are not required to obtain a search warrant for a vehicle when they have probable cause to search it, even if they have time to do so. *United States v. Graham*, 275 F.3d 490, 510 (6th Cir. 2001) ("[A] vehicle may be searched, without any indication of exigency, if the searching officers have probable cause to believe that it contains instrumentalities or evidence of the crime."); *United States v. Hofstatter*, 8 F.3d 316, 322 (6th Cir. 1993) (upholding warrantless search of car pursuant to the automobile exception, although officers had time to get a search warrant).

For these reasons, the undersigned finds the officers had probable cause to search the minivan based upon the odor of marijuana alone.

## IV.    CONCLUSION

The undersigned finds that law enforcement properly stopped and detained Defendant for a traffic violation. The officer had reasonable suspicion to frisk Defendant based upon his knowledge that Defendant was purchasing multiple firearms and appeared to be evading law enforcement. Finally, law enforcement had probable cause to search Defendant's vehicle based upon the odor of marijuana.

Accordingly, the undersigned respectfully **RECOMMENDS** that the District Judge **DENY** Defendant's Motion to Suppress [**Doc. 46**].[15]

Respectfully submitted,

Jill E. McCook
United States Magistrate Judge

---

[15]    Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2). Failure to file objections within the time specified waives the right to appeal the District Court's order. Fed. R. Crim. P. 59(b)(2); *see United States v. Branch*, 537 F.3d 582, 587 (6th Cir.), *cert. denied*, 555 U.S. 1080 (2008); *see also Thomas v. Arn*, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order). "[T]he district court need not provide *de novo* review where objections [to this report and recommendation] are [f]rivolous, conclusive, or general." *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986) (internal quotation omitted). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed. of Tchrs.*, 829 F.2d 1370, 1373 (6th Cir. 1987).